# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No.: _____

MSP RECOVERY CLAIMS, SERIES LLC,

       Plaintiff,

v.                                                              **CLASS ACTION**

AMGEN INC.; WATSON LABORATORIES,
INC.; ACTAVIS PHARMA, INC.; and TEVA
PHARMACEUTICALS USA., INC.;

       Defendants.

_____/

## CLASS ACTION COMPLAINT

Plaintiff MSP Recovery Claims LLC ("MSPRC"), on behalf of itself and all others similarly situated, brings this antitrust class action against Defendants Amgen Inc. ("Amgen"); Watson Laboratories, Inc.; Actavis Pharma, Inc.; and Teva Pharmaceuticals USA, Inc. (collectively "Teva"). Plaintiff's claims arise from Defendants' anticompetitive scheme to restrain competition in the market for Sensipar and its AB-rated generic equivalents sold in the United States. Plaintiff's allegations are made on personal knowledge as to Plaintiff and Plaintiff's own acts and on information and belief as to all other matters.

## INTRODUCTION

1.      Plaintiff brings this antitrust action on behalf of a proposed class of end-payors who indirectly purchased, reimbursed, or otherwise paid for Sensipar (cinacalcet hydrochloride tablets) or its AB-rated generic equivalent. Sensipar is a drug used to treat certain conditions associated with chronic kidney disease and thyroid cancer. Defendants have engaged in anticompetitive conduct that has prevented a less expensive generic equivalent of Sensipar from

entering the market, in violation of federal and state law. Plaintiff seeks damages, an order

enjoining defendants' anticompetitive conduct, and other appropriate relief.

2.      Amgen received FDA approval for Sensipar in March 2004. Sensipar's sales grew

rapidly. As of 2017, Amgen's United States sales were over $1 billion in sales, and were at or

near $1 billion in the first three quarters of 2018.

3.      One of Amgen's patents for Sensipar, U.S. Patent No. 6,011,068 (the "'068

Patent"), was set to expire on March 8, 2018. This patent, stating claims related to calcimimetic

compounds, was the primary patent setting forth the chemical composition of Sensipar. Because

Sensipar was a blockbuster drug, numerous generic manufacturers filed Abbreviated New Drug

Applications ("ANDAs") with the FDA seeking the approval of generic versions of Sensipar.

Teva was one such generic. Other generic manufacturers filing ANDAs included Accord

Healthcare and Intas Pharmaceuticals ("Accord"); Ajanta Pharma, Ltd. and Ajanta Pharma USA,

Inc. ("Ajanta"); Alkem Laboratories Ltd ("Alkem"); Amneal Pharmaceuticals LLC, Amneal

Pharmaceuticals of New York, LLC and Amneal Pharmaceuticals Co. India Private Ltd.

("Amneal"); Apotex Inc. and Apotex Corp. ("Apotex"); Aurobindo Pharma Ltd. and Aurobindo

Pharma USA Inc. ("Aurobindo"); Breckenridge Pharmaceutical, Inc. ("Breckinridge"); Cipla

Limited and Cipla USA, Inc. ("Cipla"); Dr. Reddy's Laboratories, Ltd. and Dr. Reddy's

Laboratories, Inc. ("Dr. Reddy's"); Emcure Pharmaceuticals Ltd. ("Emcure"); Heritage

Pharmaceuticals Inc. and Heritage Pharma Labs, Inc. ("Heritage"); Hetero USA Inc., Hetero

Labs Ltd. and Hetero Labs Ltd. Unit V ("Hetero"); Lupin Ltd. and Lupin Pharmaceuticals, Inc.

("Lupin"); Macleods Pharmaceuticals Ltd., Macleods, and Macleods Pharma USA Inc.

("MacLeods"); Micro Labs Ltd. and Micro Labs USA Inc. ("Micro Labs"); Mylan

Pharmaceuticals, Inc. and Mylan, Inc.; Piramal Healthcare UK Ltd. "Mylan"); Strides Pharma

Global PTE Ltd. And Strides Pharma, Inc. ("Strides"); Sun Pharma Global FZE and Sun Pharmaceutical Industries, Inc. ("Sun Pharma"); Teva Pharmaceuticals, USA, Inc. and Barr Pharmaceuticals; Watson Laboratories, Inc., Actavis, Inc., and Actavis Pharma, Inc.; Torrent Pharmaceuticals Ltd.; and Zydus Pharmaceuticals (USA).

4.      Between March 8, 2018, and December 27, 2018, the FDA approved ANDAs from Cipla, Aurobindo, Strides Pharma Global, Piramal Healthcare, Sun Pharma, Mylan, and Teva.

5.       As part of their applications, these generic manufacturers were required to make certain certifications against the patents covering Sensipar. Among these patents was U.S. Patent No. 9,375,405 (the "'405 patent"), titled "Rapid dissolution formulation of a calcium receptor-active compound." Unlike the '086 patent, the '405 Patent was a formulation patent, and only covered a new formulation of the existing cinacalcet hydrochloride compound.

6.      Generic manufacturers filed "Paragraph IV" certifications against the '405 patent, claiming that the patent was invalid, unenforceable, and/or not infringed by the proposed ANDA applicants' generics.

7.       In connection with the ANDAs, Amgen sued each generic manufacturer that filed an ANDA for allegedly infringing the '405 patent. Several generics manufacturers thereafter settled with Amgen, including Strides Pharma, Apotex Corp., Micro Labs, Breckenridge Pharmaceutical, Sun Pharmaceutical, Hetero Labs, Ajanta Pharma, Cipla Ltd., Mylan Pharmaceuticals, Dr. Reddy's Laboratories, Aurobindo Pharma, Macleods Pharma, Lupin Pharmaceuticals, Alkem Laboratories, Torrent Pharma, Heritage, and Emcure.

8.      Teva, Amneal, Piramal, and Zydus, on the other hand, took their claims to a bench trial in the District of Delaware in March 2018. In July 2018, after the submission of post-

trial briefs, the court issued an opinion. It found that Teva, Amneal, and Piramal's generic versions of Sensipar did not infringe the '405 patent. The Federal Circuit Court of Appeals affirmed in part and reversed in part. While the Federal Circuit found that district erred in its analysis of the Amneal formulation, it affirmed the district court's analysis and findings that Piramal's and Zydus's formulation did not infringe on the '405 patent.[1]

9.      On December 27, 2018, while the appeal was pending the FDA approved Teva's ANDA for a generic version of Sensipar. Teva immediately launched its generic product. Within the one week that followed, Teva flooded the market with roughly six weeks of product sales. In that short time, Teva reportedly made $59 million in profits while Amgen lost an estimated $79 million in profits.[2]

10.     Despite Teva's tremendous profits, on January 2, 2019, after only one week of availability of generic Sensipar, Teva and Amgen entered a confidential agreement in which Teva agreed to stop selling its generic version of Sensipar.

11.     The agreement re-established and maintained Amgen's brand monopoly by eliminating Teva as a competitor and preventing other generic entrants. Amgen's '405 patent action settlements included acceleration clauses, which permit the generics to enter the market after a short delay if another generic, like Teva, launched. The hasty deal between Amgen and Teva served as a bottleneck to avoid triggering the acceleration clauses, thereby preventing other settling generics from launching their products. Amgen and Teva thus stopped other generics from entering and driving the price of Sensipar well below Teva's discount.

---

[1] *Amgen Inc. v. Amneal Pharm., LLC*, 2020 WL 62012, at *13 (Fed. Cir. 2018).

[2] Sue Sutter, *Launch Abbreviated: Teva Halts US Generic Sensipar Sales After Patent Deal With Amgen,* PINK SHEET (Jan. 3, 2019).

12.     Harm to Plaintiff and the Class is ongoing, as there still is no generic alternative to Amgen's branded Sensipar available to purchase.

13.     An agreement by competing companies to cease competing is "anticompetitive regardless of whether the parties split a market within which both do business or whether they merely reserve one market for one and another for the other."[3] Accordingly, to redress the economic injury Defendants have already caused and continue to cause, Plaintiff on behalf of itself and all others similarly situated, seeks injunctive and other equitable relief under the federal antitrust laws, as well as damages and other monetary relief under state antitrust, consumer protection, and common laws.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1337 because this action seeks injunctive and equitable relief under the Clayton Act, 15 U.S.C. § 26. This Court also has jurisdiction under Clayton Act § 12, 15 U.S.C. § 22.

15.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action involving common questions of law or fact in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, there are more than one hundred members of the Class, and at least one member of the putative Class is a citizen of a state different from that of one of the Defendants. This Court also has supplemental jurisdiction over state law claims under 28 U.S.C. § 1367(a).

16.     Venue is appropriate within this district under 28 U.S.C. §1391 because, at all relevant times, Defendants transacted business within this district and the interstate trade and

---

[3] *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49–50 (1990).

commerce described below is carried out, in substantial part, in this district.

17.     The Court has personal jurisdiction over each Defendant. Each Defendant has transacted business, maintained substantial contacts, and committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this district. The scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this district.

18.     All conditions precedent to this action have occurred, been performed, or have been waived.

## **THE PARTIES**

19.     Plaintiff MSP Recovery Claims, Series LLC ("MSPRC") is a Delaware series limited liability company with its principal place of business in Coral Gables, Florida. MSPRC's limited liability company agreement provides for the establishment of one or more specific Series. All records of all Series are maintained together with all assets of MSPRC. Numerous Medicare Advantage Plans ("MA Plans"), which provide drug benefits to their beneficiaries under Medicare Parts C and D, 42 U.S.C. §§ 1395w-21, *et seq.*, have assigned their recovery rights to assert the claims alleged in this Complaint to MSPRC or subseries of MSPRC. The Assignors paid for Defendants' overly-priced drugs.

20.     Defendant Amgen Inc., ("Amgen") is a corporation organized and existing under the laws of Delaware, having its principal place of business at One Amgen Center Drive, Thousand Oaks, California 91320-1779. Amgen engaged in the worldwide marketing, production and distribution of generic pharmaceutical products, including in this judicial district.

21.     Defendant, Watson Laboratories, Inc., ("Watson Labs") is a company organized

and existing under the laws of Nevada, having its principal place of business at 311 Bonnie

Circle, Corona, California 92880. Watson Laboratories, Inc. is a wholly-owned subsidiary of

Watson Pharmaceuticals, Inc. Watson Laboratories is the owner of the ANDA 204377 (the

"Watson ANDA").

22.     Defendant Actavis Pharma, Inc., ("Actavis Pharma")[4] is a Delaware corporation

with its principal place of business at Morris Corporate Center III, 400 Interpace Parkway,

Parsippany, New Jersey 07054. Actavis is a direct or indirect subsidiary of Teva

Pharmaceuticals.

23.     Defendant Teva Pharmaceuticals USA, Inc., ("Teva Pharmaceuticals") is a

company organized and existing under the laws of Delaware, having its principal place of

business at 1090 Horsham Road, North Wales, Pennsylvania 19454. Teva Pharmaceuticals USA,

Inc. is a wholly owned subsidiary of Teva Pharmaceutical Industries Ltd.

24.     Defendants Actavis, Inc., Actavis Pharma, Inc., Watson Pharmaceuticals, Inc. and

Watson Laboratories, Inc., and Teva Pharmaceuticals, are collectively referred to herein as

"Teva." Teva sold generic Sensipar throughout the United States between December 27, 2018,

and January 2, 2019, under Watson's ANDA.

25.     All of Defendants' wrongful actions described in this complaint are part of, and in

furtherance of, the illegal monopolization and restraint of trade alleged herein, and were

authorized, ordered, and/or undertaken by Defendants' various officers, agents, employees, or

other representatives actively engaged in the management of Defendants' affairs (or that of their

predecessors-in-interest), within the course and scope of their duties and employment, and/or

---

[4] Actavis Pharma packaged Teva's generic Sensipar.

with the actual, apparent, and/or ostensible authority of Defendants.

## THE REPRESENTATIVE ASSIGNMENT AGREEMENTS

26.     Certain series of Plaintiff have executed irrevocable assignments of any and all rights to recover payments made on behalf of their assignors' health plan members and enrollees. These assignments authorize the series and, in turn Plaintiff through its operating agreement, to pursue and enforce all legal rights of recovery and reimbursement for health care services and Medicare benefits. For example, and only to serve to further demonstrate standing, Plaintiff alleges a few of the assignments below as examples.

27.     On March 20, 2018, Group Health Incorporated and Health Insurance Plan of Greater New York (otherwise known as "EmblemHealth" or "Emblem"), irrevocably assigned all its rights and claims to recovery against any liable entity (including defendants) for payments made on behalf of their enrollees under Medicare Parts A, B, and D to Series 16-08-483, a designated series of Plaintiff. Specifically, the assignments, attached as **Composite Exhibit A**, state the following:

> Assignor hereby irrevocably assigns, transfers, conveys, sets over and delivers to Assignee, and any of its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to all [claims against third parties], whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party in connection with the [claims] and all rights and claims against primary payers and/or . . . third parties that may be liable to Assignor arising from or relating to the [claims], including claims under consumer protection statutes and laws, and all information relating thereto, as may be applicable.

Comp. Ex. A, at 2, 4.

28.     On May 12, 2017, Summacare, Inc. ("Summacare"), irrevocably assigned all its rights and claims to recovery against any liable entity (including defendants) for payments made on behalf of its enrollees under Medicare Parts A, B, and D to MSP Recovery, LLC ("MSP

Recovery"). Specifically, the assignment, attached as **Exhibit B**, provides the following language:

> [Summacare] hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of [Summacare's] right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for [Summacare] that [Summacare] had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to [Summacare] arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims".

Ex. B, at 1-2.

29.    On June 12, 2017, MSP Recovery irrevocably assigned all rights acquired under the Summacare Assignment to Series 16-11-509, a designated series of Plaintiff:

> [Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to the [claims] (and all proceeds and products thereof) as such terms are defined in the Recovery Agreement dated May 12, 2017, by and among [Summacare] . . . and [MSP Recovery] . . . .

**Exhibit C**, at 1. Summacare consented to, acknowledged, approved, and ratified the assignment from MSP Recovery to Series 16-11-509, which is memorialized in a letter dated September 5, 2018, and attached as **Exhibit D**

30.    On March 20, 2018, Connecticare, Inc. ("Connecticare"), irrevocably assigned all its rights and claims to recovery against any liable entity (including defendants) for payments made on behalf of its enrollees under Medicare Parts A, B, and D to Series 15-09-157, a designated series of Plaintiff.  Specifically, the assignment, attached as **Exhibit E**, provides the following language:

> Assignor hereby irrevocably assigns, transfers, conveys, sets over and delivers to Assignee, and any of its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to all [claims against third parties], whether

based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party in connection with the [claims] and all rights and claims against primary payers and/or . . . third parties that may be liable to Assignor arising from or relating to the [claims], including claims under consumer protection statutes and laws, and all information relating thereto, as may be applicable.

Ex. E, at 2.

## FACTUAL ALLEGATIONS

I.      **The Cinacalcet Hydrochloride Patents and FDA Approval**

31.     Amgen listed seven patents in the Orange Book as covering Sensipar: U.S. Patent Nos. 6,211,244 (expired on October 23, 2015); 6,001,884 (expiry December 14, 2016); 6,031,003 (expired on December 14, 2016); 6,313,146 (expired December 14, 2016); 6,011,068 (expired March 8, 2018); 7,829,595 (set to expire September 22, 2026), and 9,375,405 (same).

32.     Cinacalcet hydrochloride was developed by Brigham and Women's Hospital, Inc. (the "Hospital") and NPS Pharmaceuticals, Inc. ("NPS"). This resulted in the '068, '003, '244, '146, and '884 patents (each of which has now expired), which specify the production and/or medicinal use of cinacalcet hydrochloride, with the primary substance patent being the '068 patent. These patents were originally assigned by the inventors to either NPS or NPS and the Hospital.

33.     On March 18, 1996, NPS entered into a licensing agreement with Amgen. Under the agreement, Amgen (1) became the exclusive licensee of the NPS Patents in the United States, (2) was responsible for all development and commercial activities involving Sensipar, and (3) was responsible for enforcing applicable patent rights. In return, NPS would receive royalty payments and milestone payments from Amgen on sales of Sensipar.

34.     On March 8, 2004, the FDA approved Amgen's NDA No. 021688 for using

cinacalcet hydrochloride in a method of treating patients with parathyroid carcinoma and secondary hyperparathyroidism. Beginning in April 2004, Amgen marketed, distributed, and sold Sensipar tablets throughout the United States.

35.     Amgen also became the assignee of '595 patent (issued November 9, 2010) and the '405 patent (issued June 28, 2016) from those patents' inventors. The '405 patent is a formulation patent stating claims related to a binder composition that requires one of povidone, hydroxypropyl methylcellulose, hydroxypropyl cellulose, sodium carboxymethylcellulose, or a mixture thereof as a binder present in a pharmaceutical composition.

36.     Amgen knew it would have to rely on its '405 patent to retain its exclusivity and block generics from the market after March 8, 2018.

37.     However, the '405 patent has certain intellectual property problems. Claim one of the '405 patent requires, among other things, "(d) from about 1% to 10% by weight of at least one disintegrant selected from the group consisting of crospovidine, sodium starch glycolate, croscarmellose sodium, and mixtures thereof." Thus, if a generic ANDA product formulation does not contain at least one of those chemicals, there can be no literal infringement of claim 1 or any of its dependent claims.

38.     As discussed below, a federal district court ruled that Teva (vis-a-vis the Watson ANDA) did not infringe any of the asserted claims of the '405 patent because the binder and disintegrant elements are "closed to unrecited binders and disintegrants", and "there could be no literal infringement if the [Watson] ANDA product contained an unrecited (or unlisted) binder or disintegrant."[5]

---

[5] *Amgen Inc. v. Amneal Pharms. LLC*, 328 F. Supp. 3d 373, 381 (D. Del. 2018) (Goldberg, J.).

## II.   ANDA Applicants Seek FDA Approval to Market Generic Sensipar

39.     By 2015, Amgen's U.S. sales of Sensipar topped $1 billion in revenues and was one of Amgen's top revenue products: 2015 revenue was $1.069 billion, 2016 revenue was $1.24 billion, 2017 revenue was $1.374 billion, and revenue for the first three quarters of 2018 was almost $1 billion.

40.     By 2016, generic manufacturers ("ANDA Applicants") began to file ANDAs to obtain approval to market generic versions of this blockbuster drug. Over 20 generic manufacturers filed ANDAs to market their generic cinacalcet hydrochloride products upon expiration of the '068 patent in March 2018. Each of these ANDA Applicants represented to the FDA, via a Paragraph IV certification, that Amgen's '405 patent was invalid, unenforceable, or not infringed by the ANDA Applicant's proposed generic drug.

## III.  Amgen the FDA and ANDA Applicants

41.     In September 2016, Amgen filed fourteen lawsuits (later consolidated) against various ANDA Applicants, alleging infringement of the '405 patent in the U.S. District of Delaware. The ANDA Applicants sued by Amgen were: Aurobindo, Micro Labs, Teva (for the Watson ANDA), Cipla, Strides, Sun Pharma, Dr. Reddy's, Ajanta, Amneal, Apotex, Hetero, Breckenridge, Mylan and Zydus.

42.     On May 25, 2017, Amgen also sued the FDA for denying its application for pediatric exclusivity for Sensipar. Obtaining pediatric exclusivity would have given Amgen six months of additional protection against generic manufacturers' market entry.

43.     Amgen alleged that the FDA had improperly denied an additional six months of pediatric exclusivity for Sensipar. Amgen needed the FDA to grant approval by June 8, 2017, in order to satisfy the statutory requirement that pediatric exclusivity for a pharmaceutical product

be granted no later than nine months before the expiration of the relevant patent.[6]

44.     On June 5, 2017, the FDA agreed to reconsider Amgen's request, and Amgen and the FDA agreed to stay the litigation pending that review. The FDA also agreed that if Amgen achieved a favorable outcome in the future, it would apply retroactively in order to satisfy the deadline.[7] On August 2, 2017 the FDA again denied Amgen's request.[8]

45.     Also in June 2017, Amgen sued four more generic cinacalcet hydrochloride ANDA-filers, Piramal, Alkem, Lupin and MacLeods.

46.     Specifically, Amgen claimed in each of these lawsuits, inter alia, that the generic cinacalcet hydrochloride product would infringe claims 1-6 and 8-20 of the '405 patent.

47.     The ANDA Applicants responded with defenses including noninfringement, invalidity and prosecution history estoppel. MacLeods also counterclaimed alleging sham litigation in violation of the Sherman Act, which Amgen denied.

## IV.   Amgen's Patent Litigation and Settlement Strategy

48.     By 2017, Amgen began to systematically enter into nearly identical settlements with the various ANDA Applicants. These settlements contained (1) admissions that the ANDA Applicants infringed the '405 patent; (2) agreements not to launch a generic before a certain date; and (3) acceleration clauses that permitted generic entry prior to the agreed date, only in the event another manufacturer entered the market earlier with a generic cinacalcet hydrochloride product, and only in the event Amgen did not obtain an injunction against the early entrant. For

---

[6] *Amgen Inc. v. Price*, No. 1:17-cv-1006-RDM, Dkt. No. 1 (D.D.C. May 25, 2017).

[7] *Amgen Inc. v. Price*, No. 1:17-cv-1006-RDM, Dkt. No. 15 (D.D.C. June 5, 2017).

[8] *Amgen Inc. v. Price*, No. 1:17-cv-1006-RDM, Dkt. No. 24 (D.D.C. Aug. 10, 2017).

example, on September 11 and 20, 2017, Amgen struck a delay agreement with Apotex and Micro Labs respectively and entered into stipulations of dismissal of the respective cases without prejudice.[9] Similarly Amgen's 2017 Form 10-K, filed with the SEC on February 13, 2018, noted that

> [t]he Delaware District Court signed consent judgments filed by Amgen and Breckenridge on September 21, 2017, by Amgen and Sun on November 2, 2017, by Amgen and Hetero on November 2, 2017, and by Amgen and Ajanta on November 9, 2017, each stipulating to entry of judgment of infringement and validity of the '405 Patent and an injunction prohibiting the manufacture, use, sale, offer to sell, importation of, or distribution into the United States of the respective defendant's cinacalcet product during the term of the '405 Patent unless specifically authorized pursuant to the confidential settlement agreement.

49.     In February and March 2018, Amgen settled with Cipla Mylan, Strides, Aurobindo and MacLeods. The Cipla, Mylan, Strides, Aurobindo and MacLeods settlement agreements included acceleration clauses or "authorizations" providing that, in the event that any other manufacturer succeeded in entering the market with a generic cinacalcet hydrochloride product before a licensed entry date for the settling generics, the licensed entry date would be accelerated to the earlier date.[10]

50.     The settlement agreements that Amgen struck with ANDA Applicants to settle '405 patent litigation included acceleration clauses.

51.     The acceleration clauses were intended to, and did, ensure that no other generic drug manufacturer, no matter how much time and resources it spent in its litigation against Amgen, and no matter how successful the generic drug manufacturer was in the litigation, could

---

[9] 1:16-cv-00926, Dkt Nos. 30, 32, and 34.

[10] Between March 2017 and January 2019, Amgen settled with at least seventeen ANDA Applicants.

enter the market without other generics likewise entering the market.

52.     The purpose and effect of the acceleration clauses was to dramatically reduce every generic manufacturer's incentive to try to enter the market before its licensed entry date.

**V.     Amgen Receives Unfavorable Court Rulings, Loses At Trial, And Appeals The Verdict**

53.     On January 2018, Amgen suffered a blow to its bid to obtain pediatric exclusivity. A federal district court granted the FDA summary judgment on all but one of Amgen's claims against FCDA and remanded the matter to the FDA for the limited purpose of the FDA addressing whether the FDA's denial of pediatric exclusivity in the case was inconsistent with a prior FDA pediatric-exclusivity decision on Johnson & Johnson's Ortho Tri-Cyclen.

54.      The FDA responded that its denial of pediatric exclusivity was appropriate and not inconsistent with its prior decision. Amgen appealed the decision.[11]

55.     On February 17, 2018, the federal district court ruled in the FDA's favor. This ended Amgen's bid for six additional months' exclusivity to stay on the market without any generic competition.

56.     In its February 2018 earnings call, "Amgen executives cited uncertainty around Sensipar's loss of exclusivity as a big reason for the billion-dollar gap between the low end and high end of the company's 2018 guidance."[12]

57.      On March 8, 2018—the same day that the '068 patent expired—Cipla and Aurobindo received Final Approval to market their generic cinacalcet hydrochloride products under their respective ANDAs, 208915 and 206125 and, but for Amgen's unlawful conduct,

---

[11] *Amgen Inc. v. Azar II*, No. 1:17-cv-1006-RDM, Dkt No. 88 (D.D.C. Feb. 17, 2018).

[12] Eric Sagonowsky, Amgen sued FDA for a 6-month reprieve from Sensipar generics—and lost, FiercePharma (Feb. 21, 2018), https://www.fiercepharma.com/legal/amgen-comes-up-short-lawsuit-against-fda-sensipar-pediatric-exclusivity-as-generics-inch.

would have launched their generic products.

58.     Among the lawsuits Amgen filed against generics was a September 22, 2016 complaint for patent infringement against Watson, Amneal, Piramal, and Zydus, and five other defendants. Amgen asserted that these defendants infringed claims of the '405 patent. The defendants filed counterclaims asserting that the patent was invalid and/or not infringed.

59.     A four-day bench trial on the infringement issue, as to the four remaining nonsettling defendants, Amneal, Piramal, Watson and Zydus, began on March 5, 2018.

60.     On July 27, 2018, the court ruled that Watson, Amneal and Piramal did not infringe any of the asserted claims of the '405 patent.[13]

61.     The court also found that the product described in Zydus' ANDA would not infringe some of the asserted claims but would infringe others.

62.     On August 24, 2018, the court entered final judgment stating, inter alia, that "[a] judgment of NON-INFRINGEMENT of claims 1-6 and 8-20 of the '405 patent is hereby entered in favor of Watson and against Amgen."[14]

63.     The court dismissed without prejudice, as moot, the generic manufacturer defendants' invalidity counterclaims.

64.     On September 25, 2018, Amgen appealed to the United States Court of Appeals for the Federal Circuit. On January 7, 2020, the Federal Circuit reversed in part and affirmed in part. The court found that district erred in its analysis of the Amneal formulation but affirmed the

---

[13] *Amgen Inc. v. Amneal Pharm. LLC*, 328 F. Supp. 3d 373, 386, 396 (D. Del. 2018).

[14] *Id.*

district court's analysis and findings as to Piramal's and Zydus's formulation.[15] The Federal

Circuit's decision had no bearing on the case against Watson. In fact, the Federal Circuit agreed

with the district court that Amgen's doctrine of equivalents argument was "barred by prosecution

history estoppel."[16]

## VI.   The FDA Approves the Watson ANDA and a Generic is Launched

65.     The FDA has approved at least seven ANDAs:

| Company | Approval Date |
| --- | --- |
| Cipla Ltd. | March 8, 2018 |
| Aurobindo Pharmacy | March 8, 2018 |
| Strides Pharma Global PTE Ltd. | April 30, 2018 |
| Piramal Healthcare UK Ltd | August 1, 2018 |
| Sun Pharma Global | October 11, 2018 |
| Mylan Pharmaceuticals Inc. | October 16, 2018 |
| Teva (Watson) | December 27, 2018 |

66.     On December 27, 2018, the same day the FDA approved the Watson ANDA,

Teva launched the Watson ANDA generic cinacalcet hydrochloride product at-risk (while

Amgen lost at trial, they appealed, so the litigation was technically still pending). Teva knew that

its generic launch was a substantial threat to Amgen because the launch could trigger any

acceleration clauses in the settlements of other ANDA Applicants and could open the floodgates

to more generic entrants.

67.     Generic Sensipar had tremendous success. Over the course of approximately

seven days, Teva sold six weeks' worth of product at a twenty-five percent discount off the cost

of Sensipar. In the course of about a week, Teva sold roughly six weeks' worth of generic

---

[15] *Amgen Inc. v. Amneal Pharm., LLC*, 2020 WL 62012, at *13 (Fed. Cir. 2018).

[16] *Id.* at *11.

Sensipar. Those sales generated profits of at least $59 million (assuming a 25% discount off Sensipar's price). Teva's launch also caused Amgen to lose an estimated $79 million in profits.[17]

## VII.  The Amgen-Teva Agreement Eliminates Generic Sensipar

68.     On January 2, 2019, after Amgen filed its opening appellate brief, but before a response brief was filed, Amgen and Teva executed a settlement resolving their respective infringement claims and invalidity counterclaims as to the '405 patent (the "Amgen-Teva Agreement"). This settlement was entered into, despite the fact that the district court issued a noninfringement ruling against Amgen.

69.     Under the terms of the Amgen-Teva Agreement, the parties agreed to request that the district court approve a consent judgment which contradicted the district court's previous finding of noninfringement, stating

> . . . that the manufacture, use, sale, offer to sell, and distribution of [its] Products in the United States and importation of [its] Product into the United States, would infringe the ['405 Patent"; and [that], except as otherwise provided in the Agreement, Watson, along with its "successors and assigns, [is] enjoined until the date of expiration or lapse of the last to expire claim of the ['405] Patent, including any extensions and/or additional periods of exclusivity to which Amgen is or becomes entitled, from infringing the ['405] Patent by making, having made, using, selling, offering to sell, or distributing [its] Products in the United States, or importing [its] Products into the United States.

70.     In order to enter this consent judgment, the parties requested that the district court vacate its findings made at the bench trial that Watson's ANDA Products do not infringe the '405 patent.

71.     To affect this reversal, Amgen and Teva jointly moved the district court to issue an Indicative Ruling under Federal Rule of Civil Procedure 62.1 grant the parties' motion under

---

[17] Sue Sutter, *Launch Abbreviated: Teva Halts US Generic Sensipar Sales After Patent Deal With Amgen,* PINK SHEET (Jan. 3, 2019).

Federal Rule of Civil Procedure 60(b) to vacate its non-infringement ruling as to the Watson ANDA's generic product and enter the parties' proposed consent judgment, including Teva's admission of infringement. If the Court were to issue the requested ruling, the parties would jointly notify the Federal Circuit and request that it remand Amgen's appeal as to Teva under Appellate Rule 12.1 to allow the district court to enter the appropriate orders.

72.     However, the district court denied the joint motion for indicative ruling finding that the Amgen and Teva did not present any "exceptional circumstances" to vacate the court's prior order finding non-infringement by Watson. *Amgen, Inc. v. Amneal Pharms.*, Case No. 16-cv-00853) at D.E. 439, ¶ 14 (D. Del. Mar. 26, 2019).

73.     Also in connection with the Amgen-Teva Agreement, Teva (1) immediately pulled its generic product from the market, eliminating existing competition from Teva, which was costing Amgen tens of millions of dollars; (2) agreed to stay off the market and delay selling its generic product until a "license date" in mid-2021 or earlier depending on certain occurrences; and (3) paid Amgen an undisclosed sum that was far less than the hundreds of millions Teva would have been required to pay Amgen had it been found to infringe the '405 patent. The acceleration clauses Amgen had included in its prior settlements with would-be generic Sensipar manufactures included a "safe harbor" period, giving Amgen a period to try to stop the generic that launched. The acceleration clause would only take effect after the safe harbor period lapses. Amgen's quick deal with Teva prevented these acceleration clauses from triggering.[18]

---

[18] In Amgen's April 2018 quarterly filing with the Securities and Exchange Commission, Amgen disclosed that its consent judgments with certain generic manufacturers imply that those agreements contain acceleration clauses. Specifically, Amgen stated that the "injunction prohibiting the manufacture, use, sale, offer to sell, importation of, or distribution into the United

74.      Amgen then contacted other ANDA Applicants to leverage its agreement with Teva. On January 4, 2019, counsel for Amgen wrote a letter to counsel for ANDA Applicant Cipla, stating: "Please confirm immediately that Cipla has not and will not engage in an "at risk" launch based on [Teva]'s At Risk Launch. Otherwise Amgen will seek all remedies available under the Cipla Agreement and under applicable law, including injunctive relief, breach of contract, treble damages, and sanctions." Days later, Cipla's counsel sent a letter to the court on January 10, 2019, stating that Cipla believes the Amgen-Teva Agreement is "anticompetitive, has far-reaching consequences, and raises important legal questions that are not rightly swept under the rug as the Motion would have the Court do without comment."[19]

75.      Through the Amgen-Teva Agreement, the Defendants removed a significantly cheaper generic product from the market, forestalled the launch of other approved generic cinacalcet hydrochloride products by prior settling generic manufacturers, and Teva secured, *inter alia*, a valuable launch position worth millions of dollars and likely millions from its several days' launch. As a result, Class members were deprived unlawfully of less expensive generic cinacalcet hydrochloride.

## EFFECTS OF THE SCHEME ON COMPETITION AND DAMAGES TO THE PLAINTIFF AND THE CLASS

76.      By 2015, Amgen's U.S. sales of Sensipar topped $1 billion in revenues and the brand drug was one of Amgen's top revenue products: 2015 revenue was $1.069 billion, 2016

---

States of the applicable defendants' cinacalcet hydrochloride product during the term of the '405 Patent" would not apply under certain circumstances. *Amgen SEC Form 10-Q*, 25–26 (Apr. 25, 2018).

[19] Letter from M. Farnan to The Honorable Mitchell S. Goldberg, dated January 10, 2019, *Amgen Inc. v. Amneal Pharm.*, No. 1:16-cv-00853 (D. Del.) (Dkt No. 414).

revenue was $1.24 billion, 2017 revenue was $1.374 billion, and revenue for the first three quarters of 2018 was almost $1 billion. These amounts represent billions of dollars more in sales than Amgen would have achieved absent Defendants' unlawful scheme to impair generic competition. Generic Sensipar products would have been priced at a fraction of the cost of brand Sensipar and would have quickly captured the vast majority of the market for cinacalcet hydrochloride.

77.     Defendants' unlawful agreements impaired and delayed the sale of generic Sensipar in the United States and unlawfully enabled Amgen to sell its branded Sensipar at artificially inflated prices. But for Defendants' unlawful conduct, generic competitors would have been able to compete, unimpeded, with their own generic versions of Sensipar at a much earlier date.

78.     Absent Defendants' anticompetitive conduct, generics would have entered at an earlier date, and Plaintiff's assignors and other members of the Class would have purchased lower-priced generic Sensipar and paid lower prices for generic Sensipar products sooner.

79.     As a consequence of Defendants' conduct, Plaintiff's assignors and other indirect purchasers have sustained substantial losses and damage to their business and property in the form of overcharges, the exact amount of which will be the subject of proof at trial.

## MARKET POWER AND DEFINITION

80.     The pharmaceutical marketplace is characterized by a "disconnect" between product selection and the payment obligation. State laws prohibit pharmacists from dispensing many pharmaceutical products, including Sensipar, to patients without a prescription. The prohibition on dispensing certain products without a prescription creates this disconnect. The patient's doctor chooses which product the patient will buy while patient (and in most cases his

or her insurer) has the obligation to pay for the product.

81.     Brand manufacturers exploit this price disconnect by employing large sales forces that visit doctors' offices and persuade them to prescribe the brand manufacturers' products. These sales representatives do not advise doctors of the cost of the branded products. Studies show that doctors typically are not aware of the relative costs of brand pharmaceuticals and, even when they are aware of the relative costs, they are largely insensitive to price differences because they do not pay for the products. The result is a marketplace in which price plays a comparatively unimportant role in product selection.

82.     The relative unimportance of price in the pharmaceutical marketplace reduces what economists call the price elasticity of demand, the extent to which unit sales go down when price goes up. This reduced-price elasticity, in turn, gives brand manufacturers the ability to raise price substantially above marginal cost without losing so many sales as to make the price increase unprofitable. The ability to profitably raise prices substantially above marginal costs is what economists and antitrust courts refer to as market power. The result of these pharmaceutical market imperfections and marketing practices is that brand manufacturers gain and maintain market power with respect to many branded prescription pharmaceuticals, including Sensipar.

83.     Brand-name Sensipar does not exhibit significant, positive cross-elasticity of demand with respect to price with any other cinacalcet hydrochloride product or treatment for kidney disease or thyroid cancer, other than AB-rated generic versions of Sensipar.

84.     Brand-name Sensipar is differentiated from all other cinacalcet hydrochloride products, and all other kidney disease and thyroid treatments, other than the AB-rated generic versions of Sensipar.

85.     Amgen needed to control only brand-name Sensipar and its AB-rated generic

equivalents, and no other products, in order to maintain the price of cinacalcet hydrochloride profitably at supracompetitive prices. Only the market entry of competing, AB-rated generic versions would render Defendants unable to profitably maintain their prices for Sensipar without losing substantial sales.

86.     Defendants had, and exercised, the power to exclude generic competition to brand-name Sensipar.

87.     At all material times, high barriers to entry, including regulatory protections and high costs of entry and expansion, protected branded Sensipar from the forces of price competition.

88.     There is direct evidence of market power and anticompetitive effects available in this case sufficient to show Defendants' ability to control the price of Sensipar and generic Sensipar, and to exclude relevant competitors, without the need to show the relevant antitrust markets. The direct evidence consists of, *inter alia*, the following facts: (a) generic Sensipar would have entered the market at a much earlier date, at a substantial discount to brand-name Sensipar, but for Defendants' anticompetitive conduct; and (b) Amgen's gross margin on Sensipar (including the costs of ongoing research/development and marketing) at all relevant times was very high.

89.     To the extent proof of monopoly power by defining a relevant product market is required, Plaintiff and the Class Members allege that the relevant antitrust market is the market for Sensipar and its AB-rated generic equivalents.

90.     The United States, the District of Columbia, and the U.S. territories constitute the relevant geographic market.

91.     Amgen's market share in the relevant market was 100% until December 2018,

when Teva sold generic Sensipar for only one week. After Amgen's settlement with Teva, it again obtained 100% market share.

## MARKET EFFECTS

92.     Defendants willfully and unlawfully maintained their market power by engaging in an overarching scheme to exclude competition. Defendants designed a scheme to delay competition on the products' merits, to further Amgen's anticompetitive purpose of forestalling generic competition against Sensipar, in which Teva cooperated in order to increase its own profits. Defendants carried out the scheme with the anticompetitive intent and effect of maintaining supra-competitive prices for cinacalcet hydrochloride.

93.     Defendants' acts and practices had the purpose and effect of restraining competition unreasonably and injuring competition by protecting brand Sensipar from competition. These 31 actions allowed Defendants to maintain a monopoly and exclude competition in the market for Sensipar and its AB-rated generic equivalents, to the detriment of Plaintiff's assignors and all other members of the Class.

94.     Defendants' exclusionary conduct delayed generic competition and unlawfully enabled Amgen to sell Sensipar without further generic competition. Were it not for Defendants' illegal conduct, one or more additional generic versions of Sensipar would have entered the market sooner.

95.     Defendants' illegal acts and conspiracy to delay generic competition for Sensipar caused Plaintiff's assignors and all members of the Class to pay more than they would have paid for cinacalcet hydrochloride absent this illegal conduct.

96.     If generic competitors had not been unlawfully prevented from entering the market earlier and competing in the relevant market, end-payors, such as Plaintiff's assignors

and members of the Class, would have paid less for cinacalcet hydrochloride by (a) paying lower prices on their remaining brand purchases of Sensipar; (b) substituting purchases of less expensive generic Sensipar for their purchases of more expensive brand Sensipar; and/or (c) purchasing generic Sensipar at lower prices sooner.

97.     Thus, Defendants' unlawful conduct deprived Plaintiff's assignors and members of the Class of the benefits from the competition that the antitrust laws are designed to ensure.

## ANTITRUST IMPACT

98.     During the relevant time period, Plaintiff's assignors and members of the Class purchased substantial amounts of Sensipar and/or generic Sensipar indirectly from the Defendants. As a result of Defendants' illegal conduct, Plaintiff's assignors and members of the Class were compelled to pay, and did pay, artificially inflated prices for their Sensipar purchases. Those prices were substantially greater than the prices that members of the Class would have paid absent the illegal conduct alleged herein, because: (i) the price of brand name Sensipar was artificially inflated by Defendants' illegal conduct; and/or (ii) Class members were deprived of the opportunity to purchase lower priced versions of Sensipar and generic Sensipar sooner.

99.     As a consequence, Plaintiff's assignors and members of the Class have sustained substantial losses and damage to their business and property in the form of overcharges. The full amount and forms and components of such damages will be calculated after discovery and upon proof at trial. Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supracompetitive charge passed through the chain of distribution to end-payors such as Plaintiff's assignors and members of the Class.

100.    General economic theory recognizes that any overcharge at a higher level of distribution in the chain of distribution for Sensipar results in higher prices at every level below.

Herbert Hovenkamp, FEDERAL ANTITRUST POLICY, THE LAW OF COMPETITION AND ITS PRACTICE, 624 (1994). "Every person at every stage in the chain will be poorer as a result of the monopoly price at the top", and "theoretically, one can calculate the percentage of any overcharge that a firm at one distribution level will pass on to those at the next level." *Id.*

101.    The institutional structure of pricing and regulation in the pharmaceutical drug industry assures that overcharges at the higher level of distribution are passed on to end-payors. Wholesalers and retailers passed on the inflated prices of Sensipar and/or generic Sensipar to Plaintiff's assignors and members of the Class. Further, the delayed entry of generic competition at the direct purchaser level similarly injured end-payors who were equally denied the opportunity to purchase less expensive generic Sensipar.

102.    Thus, Defendants' unlawful conduct deprived Plaintiff's assignors and the Class of the benefits of competition that the antitrust laws were designed to ensure.

103.    Defendants' unlawful anticompetitive conduct alleged herein enabled them to indirectly charge end-payors prices in excess of what they otherwise would have been able to charge absent their unlawful actions.

104.    Prices of Sensipar and generic Sensipar were artificially inflated as a direct and foreseeable result of Defendants' anticompetitive conduct.

105.    The supracompetitive prices Plaintiff's assignors and members of the Class paid are traceable to, and the direct, proximate, and foreseeable result of, Defendants' anticompetitive conduct.

106.    The overcharges Plaintiff's assignors and members of the Class paid are traceable to, and the direct, proximate, and foreseeable result of, Defendants' supracompetitive pricing.

## INTERSTATE AND INTRASTATE COMMERCE

107.    Defendants' anticompetitive conduct has substantially affected intrastate, interstate and foreign commerce.

108.    Defendants' anticompetitive conduct has substantial intrastate effects in that, *inter alia*, it deprived retailers within each state of access to less expensive generic Sensipar that they could sell to end-payors within each respective state. The delayed entry of generic Sensipar has directly affected and disrupted commerce for end-payors within each state.

109.    During the relevant time period, Sensipar was shipped into each state, and end-payors paid for Sensipar in each state.

110.    During the relevant time period, Defendants manufactured, promoted, distributed, and sold substantial amounts of Sensipar and/or generic Sensipar in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States.

111.    During the relevant time period, Defendants transmitted funds as well as contracts, invoices and other forms of business communications and transactions in a continuous and uninterrupted flow of commerce across state and national lines in connection with the sale of Sensipar.

## CLASS ACTION ALLEGATIONS

112.    Plaintiff brings this action on behalf of itself and all others similarly situated as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, seeking damages pursuant to the common law of unjust enrichment and the state antitrust, unfair competition and consumer protection laws of the states listed below (the "Indirect Purchaser States") on behalf of the following Class:

All persons and entities in the Indirect Purchaser States who indirectly purchased, paid for and/or provided reimbursement for some or all of the purchase price of Sensipar or its AB-rated generic equivalents in any form from Defendants from March 8, 2018 until the effects of Defendants' conduct cease (the "Class Period").

113.    The following persons and entities are excluded from the Class:

    a.    Defendants and their counsel, officers, directors, management, employees, subsidiaries, and affiliates;

    b.    all federal and state governmental entities except for cities, towns, municipalities or counties with self-funded prescription drug plans;

    c.    all persons or entities who purchased Sensipar or generic Sensipar for purposes of resale or directly from Defendants or their affiliates;

    d.    fully-insured health plans (i.e., health plans that purchased insurance from another third-party payor covering 100 percent of the plan's reimbursement obligations to its members);

    e.    flat co-payers (i.e., consumers who paid the same co-payment amount for brand and generic drugs);

    f.    pharmacy benefit managers;

    g.    all judges assigned to this case and any members of their immediate families; and

    h.    all counsel of record.

114.    The Class is sufficiently numerous and so widely geographically dispersed throughout the United States that joinder of all members is impracticable. Moreover, given the costs of complex antitrust litigation, it would be uneconomical for Plaintiff to bring individual claims and join them together. Given this drug's blockbuster status, Plaintiff believes there are hundreds of thousands, if not millions, of members in the Class, in an amount to be determined in discovery and at trial. The identities of Class members will be readily ascertainable through business records kept in regular order.

115.    Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff's

28

claims arise out of the same course of anticompetitive conduct that gives rise to the claims of the other Class Members. Plaintiff and all members of the Class were damaged by the same wrongful conduct of Defendants—Plaintiff and the Class paid supracompetitive prices for Sensipar and were deprived of the benefits of competition as a result of Defendants' unlawful conduct alleged herein.

116.    Plaintiff will fairly and adequately protect and represent the interests of the Class. The interests of Plaintiff are aligned with, and not antagonistic to, those of the other members of the Class.

117.    Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation and have particular experience with class action antitrust litigation involving pharmaceutical products.

118.    Questions of law and fact common to the members of the Class predominate over questions that may affect only individual class members, because Defendants have acted on grounds generally applicable to the entire Class, thereby making overcharge damages with respect to the Class as a whole appropriate. Such generally applicable conduct is inherent in Defendants' wrongful conduct. Questions of law and fact common to the Class include:

       a.     Whether Defendants' conspired to delay generic competition in the market for cinacalcet hydrochloride tablets;

       b.     Whether Defendants' agreement was a per se violation of federal and state antitrust laws;

       c.      Whether Defendants' agreement violated federal and state antitrust laws under a "quick look" analysis;

       d.     Whether Defendants' agreement violated federal and state antitrust laws under a Rule of Reason analysis;

       e.     To the extent the Rule of Reason applies, whether the relevant product market is cinacalcet hydrochloride tablets;

f.   To the extent the Rule of Reason applies, whether the relevant geographic market is the United States, including its territories, possessions, and the Commonwealth of Puerto Rico.

g.   Whether Amgen unlawfully maintained monopoly power through the Defendants' Agreement;

h.   Whether Defendants' scheme, in whole or in part, has substantially affected intrastate and interstate commerce;

i.   Whether Defendants' agreement harmed competition;

j.   The nature and scope of injunctive relief;

k.   Whether Defendants' unlawful agreement, in whole or in part, caused antitrust injury through overcharges to the business or property of Plaintiff and the members of the Class;

l.   The quantum of overcharges paid by the Class in the aggregate; and

m.   Disgorgement.

119.   Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

120.   Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### COUNT I
**Contract, Combination, and Conspiracy
in Restraint of Trade under the Sherman Act § 1
(Against All Defendants)**

121.    Plaintiff incorporates the preceding paragraphs by reference.

122.    An agreement by competing companies to cease competing is "anticompetitive regardless of whether the parties split a market within which both do business or whether they merely reserve one market for one and another for the other."[20] Defendants entered into an unlawful market division agreement that restrained competition in the market for branded and generic versions of Sensipar. Their agreement is and was a contract, combination, and/or conspiracy that substantially, unreasonably, and unduly restrained trade in the relevant market, the purpose and effect of which was to

      a.    eliminate existing competition between Amgen and Teva and to prevent Teva from competing with Amgen by selling its generic version of Sensipar until mid-2021;

      b.    delay entry of generic versions of Sensipar by companies other than Teva in order to maintain the period in which Amgen brand Sensipar monopolizes the relevant market; and

      c.    raise and maintain the prices that Plaintiff's assignors and the Class Members would pay for Sensipar to and at supra-competitive levels.

123.    The unlawful Amgen-Teva market division agreement is a per se violation of the Sherman Act, 15 U.S.C. § 1. Moreover, if the conduct alleged in this Complaint is held subject to

---

[20] *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49–50 (1990).

a "quick look" analysis, it would satisfy the Supreme Court's test in *California Dental*.[21] That is, "an observer with even a rudimentary understanding of economics could conclude that the [agreement] in question would have an anticompetitive effect on customers and markets."[22]

124.    Even if the conduct alleged in this Complaint is held subject to the Rule of Reason, there is no legitimate, non-pretextual, procompetitive business justification for the value Teva received that outweighs the agreements harmful effects. Specifically, under *FTC v. Actavis, Inc.*, 133 S. Ct. 2223, 2237 (2013), a patent settlement agreement between a brand and generic manufacturer may be unlawful when the brand provides the generic manufacturer a "large and unjustified" payment in exchange for the generic manufacturer dropping its challenge to the brand manufacturer's patents, especially when the size of the payment exceeds any saved or avoided litigation costs.

125.    Here, in exchange for Teva's agreement to delay entering the market until mid-2021 notwithstanding its judgment of non-infringement, under the Amgen-Teva agreement, Teva received at least (a) tens of millions of dollars in profits from sales of generic Sensipar, which it retained and did not pay to Amgen, and which reduced Amgen's own revenue from sales of branded Sensipar; (b) an acceleration provision, assuring Teva an ability to resume sales of its generic product if another generic launched before Teva's entry date; and (c) additional value from Amgen's agreement to pay Teva to license certain other Teva products.

126.    Individually and collectively, the value that Amgen transferred and that Teva received under their agreement exceeded the costs of continued litigation or any arguably

---

[21] *California Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999).

[22] *Id.* at 770.

procompetitive benefits, and thus was "large and unjustified." Indeed, given that Teva made the

calculated decision to launch at risk, presumably based on its own assessment of the strength of

its arguments on appeal, it would have been unlikely to change course by withdrawing from the

market just one week later absent some significant inducement by Amgen. Accordingly, the

Amgen-Teva agreement is unlawful.

127.    As a direct and proximate result of Defendants' violation of Sherman Act § 1,

Plaintiff and the Class have been injured in their business and property throughout the Class

Period.

128.    Plaintiff and the Class are entitled to injunctive and other equitable relief,

pursuant to 15 U.S.C. § 26.

## COUNT II
### Monopolization under the Sherman Act § 2
### (Against Amgen)

129.    Plaintiff incorporates the preceding paragraphs by reference.

130.    Amgen entered into an unlawful market division agreement that restrained

competition in the market for Sensipar and its AB-rated generic equivalents. The agreement

> a.    eliminates existing competition between Amgen and Teva and prevents
>       Teva from competing with Amgen by selling its generic version of
>       Sensipar until mid-2021;
>
> b.    delays entry of generic versions of Sensipar by companies other than Teva
>       in order to maintain the period in which Amgen monopolizes the relevant
>       market; and
>
> c.    raises and maintains the prices that Plaintiff's assignors and the Class
>       Members have to pay for Amgen's Sensipar to and at supra-competitive
>       levels.

131.    Amgen's conduct violates Section 2 of the Sherman Act, 15 U.S.C. § 2. Amgen's

agreement with Teva perpetuates Amgen's monopoly in the relevant market by excluding

competition from Teva, as well as other generics that would have entered pursuant to acceleration clauses in their settlements with Amgen. As a result, Amgen's share of the cinacalcet hydrochloride tablet market is at or near 100%.

132.    As a direct and proximate result of Defendants' violation of Sherman Act § 2, Plaintiff and the Class have been injured in their business and property throughout the Class Period.

133.    Plaintiff and the Class are entitled to injunctive and other equitable relief, pursuant to 15 U.S.C. § 26.

## COUNT III
### Conspiracy and Combination in Restraint of Trade under State Law
### (Against All Defendants)

134.    Plaintiff incorporates the preceding paragraphs by reference.

135.    Defendants entered into an unlawful market division agreement that restrained competition in the market for branded and generic versions of Sensipar. The agreement is and was a contract, combination, and/or conspiracy that substantially, unreasonably, and unduly restrained trade in the relevant market, the purpose and effect of which was to

      a.    eliminate existing competition between Amgen and Teva and to prevent Teva from competing with Amgen by selling its generic version of Sensipar until mid-2021;

      b.    delay entry of generic versions of Sensipar by companies other than Teva in order to maintain the period in which Amgen brand Sensipar monopolizes the relevant market; and

      c.    raise and maintain the prices that Plaintiff's assignors and the Class Members would pay for Sensipar to and at supra-competitive levels.

136.    The unlawful Amgen-Teva market division agreement is a per se violation of the Sherman Act, 15 U.S.C. § 1. Moreover, if the conduct alleged in this Complaint is held subject to

a "quick look" analysis, it would satisfy the Supreme Court's test in *California Dental*.[23] That is, "an observer with even a rudimentary understanding of economics could conclude that the [agreement] in question would have an anticompetitive effect on customers and markets."[24]

137.    Even if the conduct alleged in this Complaint is held subject to the Rule of Reason, there is no legitimate, non-pretextual, procompetitive business justification for the value Teva received that outweighs the agreement's harmful effects. Specifically, under *FTC v. Actavis*, Inc., 133 S. Ct. 2223, 2237 (2013), a patent settlement agreement between a brand and generic manufacturer may be unlawful when the brand provides the generic manufacturer a "large and unjustified" payment in exchange for the generic manufacturer dropping its challenge to the brand manufacturer's patents, especially when the size of the payment exceeds any saved or avoided litigation costs.

138.    Here, in exchange for Teva's agreement to delay entering the market until mid-2021 notwithstanding its judgment of non-infringement, under the Amgen-Teva agreement, Teva received at least (a) tens of millions of dollars in profits from sales of generic Sensipar, which it retained and did not pay to Amgen, and which reduced Amgen's own revenue from sales of branded Sensipar; (b) an acceleration provision, assuring Teva an ability to resume sales of its generic product if another generic launched before Teva's entry date; and (c) additional value from Amgen's agreement to pay Teva to license certain other Teva products.

139.    Individually and collectively, the value that Amgen transferred and Teva received under their agreement exceeded the costs of continued litigation or any arguably procompetitive

---

[23] *California Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999).

[24] *Id.* at 770.

benefits, and thus was "large and unjustified." Indeed, given that Teva made the calculated decision to launch at risk, presumably based on its own assessment of the strength of its arguments on appeal, it would have been unlikely to change course by withdrawing from the market just one week later absent some significant inducement by Amgen. Accordingly, the Amgen-Teva agreement is unlawful.

140.    Defendants' conduct violated the following state antitrust laws:

a.    Ariz. Rev. Stat. §§ 44-1401, et seq., with respect to purchases in Arizona by the Class Members;

b.    Cal. Bus. Code §§ 16700, et seq., and Cal. Bus. Code §§ 17200, et seq., with respect to purchases in California by the Class Members;

c.    D.C. Code Ann. §§ 28-4501, et seq., with respect to purchases in the District of Columbia by the Class Members;

d.    Hawaii Code § 480, et seq., with respect to purchases in Hawaii by the Class Members;

e.    740 Ill. Comp. Stat. Ann. 10 / 3, et seq., with respect to purchases in Illinois by the Class Members;

f.    Iowa Code §§ 553 et seq., with respect to purchases in Iowa by the Class Members;

g.    Kan. Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas by Class Members;

h.    Me. Rev. Stat. Ann. 10, §§ 1101, et seq., with respect to purchases in Maine by the Class Members;

i.    Mich. Comp. Laws Ann. §§ 445.772, et seq., with respect to purchases in Michigan by the Class Members;

j.    Minn. Stat. §§ 325D.49, et seq., with respect to purchases in Minnesota by the Class Members;

k.    Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi by members of the Class Members;

l.    Neb. Code Ann. §§ 59-801, et seq., with respect to purchases in Nebraska by the Class Members;

m.    Nev. Rev. Stat. Ann. §§ 598A, et seq., with respect to purchases in Nevada by the Class Members, in that thousands of sales of branded and generic versions of Sensipar took place at Nevada pharmacies, purchased by Nevada end-payors at supracompetitive prices caused by Defendants' conduct;

n.    N.H. Rev. Stat. Ann. §§ 356:1, et seq., with respect to purchases in New Hampshire by the Class Members;

o.    N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico by the Class Members;

p.    N.Y. Gen. Bus. L. §§ 340, et seq., with respect to purchases in New York by the Class Members;

q.    N.C. Gen. Stat. §§ 75-1, et seq., with respect to purchases in North Carolina by the Class Members;

r.    N.D. Cent. Code §§ 51-08.1-01, et seq., with respect to purchases in North Dakota by the Class Members;

s.    Or. Rev. Stat. §§ 6.46.705, et seq., with respect to purchases in Oregon by the Class Members;

t.    S.D. Codified Laws Ann. §§ 37-1, et seq., with respect to purchases in South Dakota by the Class Members;

u.    Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee by the Class Members, with thousands of end-payors in Tennessee paying substantially higher prices for branded and generic versions of Sensipar at Tennessee pharmacies;

v.    Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah by Class Members who are either citizens or residents of Utah;

w.    Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont by the Class Members;

x.    W.Va. Code §§ 47-18-3, et seq., with respect to purchases in West Virginia by the Class Members; and

y.    Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin by the Class Members, in that the actions alleged herein substantially affected the people of Wisconsin, with thousands of end-payors in Wisconsin paying substantially higher prices for branded and generic versions of Sensipar at Wisconsin pharmacies.

141.    Plaintiff and Class Members seek damages and multiple damages as permitted by law for the injuries they suffered as a result of Defendants' anticompetitive conduct.

142.    Defendants are jointly and severally liable for all damages suffered by Plaintiff and the Class Members.

## COUNT IV
### Monopolization and Monopolistic Scheme under State Law
### (Against Amgen)

143.    Plaintiff incorporates the preceding paragraphs by reference.

144.    Amgen entered into an unlawful market division agreement that restrained competition in the market for branded and generic versions of Sensipar. The agreement

> a.    eliminates existing competition between Amgen and Teva and prevents Teva from competing with Amgen by selling its generic version of Sensipar until mid-2021;
>
> b.    delays entry of generic versions of Sensipar by companies other than Teva in order to maintain the period in which Amgen monopolizes the relevant market; and
>
> c.    raises and maintains the prices that Plaintiff and the Class Members have to pay for Amgen's Sensipar to and at supra-competitive levels.

145.    Amgen's agreement with Teva perpetuates Amgen's monopoly in the relevant market by excluding competition from Teva, as well as other generics that would have entered pursuant to acceleration clauses in their settlements with Amgen. As a result, Amgen's share of the cinacalcet hydrochloride tablet market is at or near 100%.

146.    Defendants' conduct violated the following state antitrust laws:

> a.    Ariz. Rev. Stat. §§ 44-1401, et seq., with respect to purchases in Arizona by the Class Members;
>
> b.    Cal. Bus. Code §§ 16700, et seq., and Cal. Bus. Code §§ 17200, et seq., with respect to purchases in California by the Class Members;
>
> c.    D.C. Code Ann. §§ 28-4501, et seq., with respect to purchases in the

District of Columbia by the Class Members;

d.      Hawaii Code § 480, et seq., with respect to purchases in Hawaii by the Class Members;

e.      740 Ill. Comp. Stat. Ann. 10 / 3, et seq., with respect to purchases in Illinois by the Class Members;

f.      Iowa Code §§ 553 et seq., with respect to purchases in Iowa by the Class Members;

g.      Kan. Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas by Class Members;

h.      Me. Rev. Stat. Ann. 10, §§ 1101, et seq., with respect to purchases in Maine by the Class Members;

i.      Mich. Comp. Laws Ann. §§ 445.772, et seq., with respect to purchases in Michigan by the Class Members;

j.      Minn. Stat. §§ 325D.49, et seq., with respect to purchases in Minnesota by the Class Members;

k.      Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi by members of the Class Members;

l.      Neb. Code Ann. §§ 59-801, et seq., with respect to purchases in Nebraska by the Class Members;

m.      Nev. Rev. Stat. Ann. §§ 598A, et seq., with respect to purchases in Nevada by the Class Members, in that thousands of sales of branded and generic versions of Sensipar took place at Nevada pharmacies, purchased by Nevada end-payors at supracompetitive prices caused by Defendants' conduct;

n.      N.H. Rev. Stat. Ann. §§ 356:1, et seq., with respect to purchases in New Hampshire by the Class Members;

o.      N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico by the Class Members;

p.      N.Y. Gen. Bus. L. §§ 340, et seq., with respect to purchases in New York by the Class Members;

q.      N.C. Gen. Stat. §§ 75-1, et seq., with respect to purchases in North Carolina by the Class Members;

r.      N.D. Cent. Code §§ 51-08.1-01, et seq., with respect to purchases in North

Dakota by the Class Members;

s.   Or. Rev. Stat. §§ 6.46.705, et seq., with respect to purchases in Oregon by the Class Members;

t.   S.D. Codified Laws Ann. §§ 37-1, et seq., with respect to purchases in South Dakota by the Class Members;

u.   Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee by the Class Members, with thousands of end-payors in Tennessee paying substantially higher prices for branded and generic versions of Sensipar at Tennessee pharmacies;

v.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah by Class Members who are either citizens or residents of Utah;

w.   Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont by the Class Members;

x.   W.Va. Code §§ 47-18-3, et seq., with respect to purchases in West Virginia by the Class Members; and

y.   Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin by the Class Members, in that the actions alleged herein substantially affected the people of Wisconsin, with thousands of end-payors in Wisconsin paying substantially higher prices for branded and generic versions of Sensipar at Wisconsin pharmacies.

147.   Plaintiff and the Class Members seek damages and multiple damages as permitted by law for the injuries they suffered as a result of Amgen's anticompetitive conduct.

## COUNT V
### State Consumer Protection Violations
### (Against All Defendants)

148.   Plaintiff incorporates the preceding paragraphs by reference

149.   Defendants engaged in unfair competition or unfair, unconscionable acts or practices in violation of the state consumer protection statutes to wrongfully perpetuate their concerted conduct to restrain trade in the relevant market.

150.   As a direct and proximate result of Defendants' unfair, unconscionable and/or

deceptive conduct, Plaintiff's assignors and the Class members were: (1) denied the opportunity to purchase lower-priced generic Sensipar; and 2) paid higher prices for Sensipar and/or its AB-rated generics that they would have paid but for Defendants' conduct.

151. The Agreements among Defendants to allow Amgen to monopolize the Sensipar market includes overt acts between separate economic entities—actual and potential competitors—and is illegal under state antitrust laws.

152. The gravity of harm from Defendants' wrongful conduct significantly outweighs any conceivable utility from that conduct. Plaintiff's assignors and Class members could not reasonably have avoided injury from Defendants' wrongful conduct.

153. There was and is a gross disparity between the price that Plaintiff's assignors and the Class members paid for Sensipar and the value they received. Much more affordable generic Sensipar would have been available sooner and in greater quantity, and prices for Sensipar would have been far lower, but for Defendants' unfair, unconscionable, and deceptive conduct.

154. As a direct and proximate result of Defendants' anticompetitive, unfair, unconscionable, and/or deceptive conduct, Plaintiff's assignors and Class members were denied the opportunity to purchase generic Sensipar and forced to pay higher prices for Sensipar and generic Sensipar.

155. By engaging in such conduct, Defendants violated the following consumer protection laws:

      a.    <u>Alaska</u>: The aforementioned practices by the Defendants were and are in violation of the Alaska Unfair Trade Practices and Consumer Protection Laws, Alaska Stat. §45.50.471, *et seq*. with respect to purchases of Sensipar and AB rated generic equivalents in Alaska by Class Members and/or purchases by Alaska residents.

      b.    <u>Florida</u>: The aforementioned practices by the Defendants were and are in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla.

Stat. Ann. §501.201, *et seq*. with respect to purchases of Sensipar and AB rated generic equivalents in Florida by Class Members and/or purchases by Florida residents.

c.      Idaho: The aforementioned practices by the Defendants were and are in violation of the Idaho Consumer Protection Act, Idaho Code Ann. §48,601, *et seq*. with respect to purchases of Sensipar and AB rated generic equivalents in Idaho by Class Members and/or purchases by Idaho residents.

d.      Massachusetts: The aforementioned practices by the Defendants were and are in violation of the Massachusetts Regulation of Business Practice & Consumer Protection Act, Mass. Gen. L. Ch. 93A §1 *et seq*., with respect to purchases of Sensipar and AB-rated generic equivalents in Massachusetts by Class Members and/or purchases by Massachusetts residents.

e.      Michigan: The aforementioned practices by Defendants were and are in violation of the Michigan Consumer Protection Act, Mich. Comp. Laws § 445.901, *et seq*., with respect to purchases of Sensipar and AB-rated generic equivalents in Michigan by Class Members and/or purchases by Michigan residents.

f.      Nebraska: The aforementioned practices by the Defendants were and are in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. Ann. §§ 59-1601, *et seq*., with respect to purchases of Sensipar and AB-rated generic equivalents in Nebraska by Class Members and/or purchases by Nebraska residents.

g.      Nevada: The aforementioned practices by the Defendants were and are in violation of Nev. Rev. Stat. §§ 598.0903, *et seq*., with respect to purchases of Sensipar and AB-rated generic equivalents in Nevada by Class Members and/or purchases by Nevada residents.

h.      New Hampshire: The aforementioned practices by the Defendants were and are in violation of, N.H. Rev. Stat. §§ 358-A:1, *et seq*., with respect to purchases of Sensipar and AB-rated generic equivalents in New Hampshire by Class Members and/or purchases by New Hampshire residents.

i.      New Mexico: The aforementioned practices by the Defendants were and are in violation of the New Mexico Unfair Practices Act, N.M. Stat. Ann. § 57-12-1, *et seq*. with respect to purchases of Sensipar and AB-rated generic equivalents in New Mexico by Class Members and/or purchases by New Mexico residents.

j. <u>North Dakota</u>: The aforementioned practices by the Defendants were and are in violation of N.D. Cent §§ 51-15-01, *et seq.* with respect to purchases of Sensipar and AB-rated generic equivalents in North Dakota by Class Members and/or purchases by North Dakota residents.

k. <u>West Virginia</u>: The aforementioned practices by the Defendant were and are in violation of the West Virginia Consumer Credit and Protection Act, W.Va. Code §§ 46A-6-101, *et seq.*, with respect to purchases of Sensipar and AB-rated generic equivalents in West Virginia by Class Members and/or purchases by West Virginia residents.

156. Plaintiff and members of the Class have been injured in their business or property by reason of Defendant's anticompetitive, unfair, unconscionable, and/or deceptive conduct. Their injuries consist of (1) being denied the opportunity to purchase lower-priced generic Sensipar sooner; and (2) paying higher prices for Sensipar than they would have paid in the absence of Defendant's conduct. Their injury consists of paying higher prices for Sensipar and/or generic Sensipar than they would have paid in the absence of these violations. This injury is of the type the state consumer protection statutes were designed to prevent and directly results from Defendants' unlawful conduct.

157. On behalf of itself and the Class, Plaintiff seeks all appropriate relief provided for under the above-mentioned statutes.

**<u>COUNT VI</u>**
**Unjust Enrichment**
**(Against All Defendants)**

158. Plaintiff incorporates by reference the preceding allegations.

159. To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

160. This claim is pled by Plaintiff and the Class against all Defendants.

161. Defendants have financially benefited from overcharges on sales of branded and

43

generic versions of Sensipar, which resulted from the unlawful and inequitable acts alleged in this Complaint. These overcharges were borne by Plaintiff and the Class Members who purchased and/or reimbursed all or part of the purchase price of branded and generic Sensipar. The benefits conferred upon Defendants are substantial and measurable, in that the revenues Defendants have earned due to unlawful overcharges are ascertainable by review of both sales records and the unlawful agreement itself.

162.    There is gross disparity between the price that Plaintiff and the Class Members paid for Sensipar compared to what they would have paid for less expensive generic versions of Sensipar, which should and would have been available but for Defendants' unlawful and inequitable conduct.

163.    Defendants repeatedly and continuously received financial benefits at the expense of Plaintiff and the Class Members through each sale of branded and generic versions of Sensipar at an inflated price.

164.    It would be futile for Plaintiff and the Class Members to seek a remedy from any party with whom they had or have privity of contract. Defendants have paid no consideration to any other person for any of the benefits they received indirectly from Plaintiff and the Class Members.

165.    It would be futile for Plaintiff and the Class Members to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased Sensipar, as those intermediaries cannot reasonably be expected to compensate Plaintiff and the Class Members for Defendants' unlawful conduct.

166.    The financial benefits that Defendants derived rightfully belong to Plaintiff and the Class Members, which paid anticompetitive prices that inured to Defendants' benefit.

44

167.     It would be inequitable under the unjust enrichment principles of the states listed below for Defendants to retain any of the overcharges that Plaintiff and the Class Members paid for branded and generic versions of Sensipar, which were derived from Defendants' anticompetitive, unfair, and unconscionable methods, acts, and trade practices.

168.     Defendants should be compelled to disgorge all unlawful or inequitable proceeds received by them into a common fund for the benefit of Plaintiff and the Class Members.

169.     A constructive trust should be imposed upon all unlawful or inequitable sums Defendants received, which arise from overpayments for branded and generic versions of Sensipar by Plaintiff and the Class Members.

170.     Plaintiff and the Class Members have no adequate remedy at law.

171.     By engaging in the foregoing unlawful or inequitable conduct, which deprived Plaintiff and the Class Members of the opportunity to purchase lower-priced generic versions of Sensipar and forced them to pay higher prices for branded and generic versions of Sensipar, Defendants have been unjustly enriched in violation of the common law of various states and commonwealths, as outlined below:

**Alabama**

172.     Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Alabama at prices that were more than they would have been but for Defendants' actions. Defendants received money from the Class as a direct result of the unlawful overcharges and have retained this money. Defendants have benefitted at the expense of the Class from revenue resulting from unlawful overcharges for branded and generic versions of Sensipar. It is inequitable for Defendants to accept and retain the benefits received without compensating the Class.

**Alaska**

173.      Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Alaska at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants appreciated the benefits bestowed upon them by the Class. Defendants accepted and retained the benefits bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Arizona**

174.      Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Arizona at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for branded and generic versions of Sensipar. The Class has been impoverished by the overcharges for branded and generic versions of Sensipar resulting from Defendants' unlawful conduct. Defendants' enrichment and the Class's impoverishment are connected. There is no justification for Defendants' receipt of the benefits causing their enrichment and the Class's impoverishment, because the Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. The Class has no remedy at law.

**Arkansas**

175.      Defendants unlawfully overcharged Class Members, who made purchases of or

reimbursements for branded and generic versions of Sensipar in Arkansas at prices that were more than they would have been but for Defendants' actions. Defendants received money from the Class as a direct result of the unlawful overcharges and have retained this money. Defendants have paid no consideration to any other person in exchange for this money. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**California**

176.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in California at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit from the Class as a direct result of the unlawful overcharges. Defendants retained the benefits bestowed upon them under inequitable and unjust circumstances at the expense of the Class.

**Colorado**

177.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Colorado at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit from the Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. Defendants have benefitted at the expense of the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Connecticut**

178.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Connecticut at prices that were

more than they would have been but for Defendants' actions. Defendants were benefitted in the nature of revenue resulting from unlawful overcharges to the economic Case detriment of the Class. Defendants have paid no consideration to any other person in exchange for this benefit. Defendants retained the benefits bestowed upon them under inequitable and unjust circumstances at the expense of the Class.

**Delaware**

179.     Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Delaware at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for branded and generic versions of Sensipar. The Class has been impoverished by the overcharges for branded and generic versions of Sensipar resulting from Defendants' unlawful conduct. Defendants' enrichment and the Class's impoverishment are connected. There is no justification for Defendants' receipt of the benefits causing their enrichment, because the Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. The Class has no remedy at law.

**District of Columbia**

180.     Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in the District of Columbia at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to the

Class. Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits.

**Florida**

181.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Florida at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants appreciated the benefits bestowed upon them by the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Georgia**

182.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Georgia at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Hawaii**

183.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Hawaii at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Under the circumstances, it would be inequitable for

Defendants to retain such benefits without compensating the Class.

**Idaho**

184.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Idaho at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants appreciated the benefit conferred upon them by the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Illinois**

185.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Illinois at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to the Class. It is against equity, justice, and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

**Iowa**

186.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Iowa at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for branded and generic versions of Sensipar,

which revenue resulted from anticompetitive prices paid by the Class, which inured to Defendants' benefit. Defendants' enrichment has occurred at the expense of the Class. Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating the Class.

### Kansas

187.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Kansas at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

### Kentucky

188.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Kentucky at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants appreciated the benefit conferred upon them by the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

### Louisiana

189.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Louisiana at prices that were

more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for branded and generic versions of Sensipar. The Class has been impoverished by the overcharges for branded and generic versions of Sensipar resulting from Defendants' unlawful conduct. Defendants' enrichment and the Class's impoverishment are connected. There is no justification for Defendants' receipt of the benefits causing their enrichment, because the Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. The Class has no other remedy at law.

**Maine**

190.     Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Maine at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants were aware of or appreciated the benefit bestowed upon them by the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Maryland**

191.     Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Maryland at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants were aware of or appreciated the benefit bestowed upon them by the Class. Under the circumstances, it would be inequitable for

Defendants to retain such benefits without compensating the Class.

**Massachusetts**

192.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Massachusetts at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants were aware of or appreciated the benefit conferred upon them by the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Michigan**

193.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Michigan at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit from the Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Minnesota**

194.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Minnesota at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges

to the economic detriment of the Class. Defendants appreciated and knowingly accepted the benefits bestowed upon them by the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Mississippi**

195.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Mississippi at prices that were more than they would have been but for Defendants' actions. Defendants received money from the Class as a direct result of the unlawful overcharges. Defendants retain the benefit of overcharges received on the sales of branded and generic versions of Sensipar, which in equity and good conscience belong to the Class on account of Defendants' anticompetitive conduct. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Missouri**

196.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Missouri at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants appreciated the benefit bestowed upon them by the Class. Defendants accepted and retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to the Class.

**Montana**

197.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Montana at prices that were

more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Nebraska**

198.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Nebraska at prices that were more than they would have been but for Defendants' actions. Defendants received money from the Class as a direct result of the unlawful overcharges and have retained this money. Defendants have paid no consideration to any other person in exchange for this money. In justice and fairness, Defendants should disgorge such money and remit the overcharged payments back to the Class.

**Nevada**

199.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Nevada at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants in the nature of revenue resulting from unlawful overcharges for branded and generic versions of Sensipar. Defendants appreciated the benefits bestowed upon them by the Class, for which they have paid no consideration to any other person. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**New Hampshire**

200.    Defendants unlawfully overcharged Class Members, who made purchases of or

reimbursements for branded and generic versions of Sensipar in New Hampshire at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit from the Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. Under the circumstances, it would be unconscionable for Defendants to retain such benefits.

**New Jersey**

201.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in New Jersey at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit from the Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to the Class. Defendants have paid no consideration to any other person for any of the unlawful benefits they received from the Class with respect to Defendants' sales of branded and generic versions of Sensipar. Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating the Class.

**New Mexico**

202.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in New Mexico at prices that were more than they would have been but for Defendants' actions. Defendants have knowingly benefitted at the expense of the Class from revenue resulting from unlawful overcharges for branded and generic versions of Sensipar. To allow Defendants to retain the benefits would be

unjust because the benefits resulted from anticompetitive pricing that inured to Defendants'

benefit and because Defendants have paid no consideration to any other person for any of the

benefits they received.

**New York**

203.     Defendants unlawfully overcharged Class Members, who made purchases of or

reimbursements for branded and generic versions of Sensipar in New York at prices that were

more than they would have been but for Defendants' actions. Defendants have been enriched by

revenue resulting from unlawful overcharges for branded and generic versions of Sensipar,

which revenue resulted from anticompetitive prices paid by the Class, which inured to

Defendants' benefit. Defendants' enrichment has occurred at the expense of the Class. It is

against equity and good conscience for Defendants to be permitted to retain the revenue resulting

from their unlawful overcharges.

**North Carolina**

204.     Defendants unlawfully overcharged Class Members, who made purchases of or

reimbursements for branded and generic versions of Sensipar in North Carolina at prices that

were more than they would have been but for Defendants' actions. The Class has conferred an

economic benefit upon Defendants in the nature of revenue resulting from unlawful overcharges

to the economic detriment of the Class. The Class did not interfere with Defendants' affairs in

any manner that conferred these benefits upon Defendants. The benefits conferred upon

Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges

arising from unlawful overcharges to the Class. The benefits conferred upon Defendants are

measurable, in that the revenue Defendants have earned due to unlawful overcharges are

ascertainable by review of sales records. Defendants consciously accepted the benefits conferred

upon them.

**North Dakota**

205.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in North Dakota at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for branded and generic versions of Sensipar. The Class has been impoverished by the overcharges for branded and generic versions of Sensipar resulting from Defendants' unlawful conduct. Defendants' enrichment and the Class's impoverishment are connected. There is no justification for Defendants' receipt of the benefits causing their enrichment, because the Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. The Class has no remedy at law. Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating the Class.

**Oklahoma**

206.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Oklahoma at prices that were more than they would have been but for Defendants' actions. Defendants received money from the Class as a direct result of the unlawful overcharges and have retained this money. Defendants have paid no consideration to any other person in exchange for this money. The Class has no remedy at law. It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

**Oregon**

207.    Defendants unlawfully overcharged Class Members, who made purchases of or

reimbursements for branded and generic versions of Sensipar in Oregon at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants were aware of the benefit bestowed upon them by the Class. Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating the Class.

**Pennsylvania**

208.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Pennsylvania at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants appreciated the benefit bestowed upon them by the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Puerto Rico**

209.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Puerto Rico at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for branded and generic versions of Sensipar. The Class has been impoverished by the overcharges for branded and generic versions of Sensipar resulting from Defendants' unlawful conduct. Defendants' enrichment and the Class's impoverishment are connected. There is no justification for Defendants' receipt of the benefits causing their enrichment and the Class's impoverishment, because the Class paid

supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. The Class has no remedy at law.

**Rhode Island**

210.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Rhode Island at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants appreciated the benefit bestowed upon them by the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**South Carolina**

211.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in South Carolina at prices that were more than they would have been but for Defendants' actions. The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to the Class. Defendants realized value from the benefit bestowed upon them by the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**South Dakota**

212.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in South Dakota at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit

from the Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. Defendants were aware of the benefit bestowed upon them by the Class. Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits without reimbursing the Class.

**Tennessee**

213.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Tennessee at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants appreciated the benefit bestowed upon them by the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class. It would be futile for the Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from the Class with respect to Defendants' sales of branded and generic versions of Sensipar. It would be futile for The Class to exhaust all remedies against the entities with which the Class has privity of contract because the Class did not purchase branded and generic versions of Sensipar directly from any Defendant.

**Texas**

214.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Texas at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit from the Class in the nature of revenue resulting from the unlawful overcharges, which revenue

resulted from anticompetitive prices that inured to the benefit of Defendants. Defendants were aware of or appreciated the benefit bestowed upon them by the Class. The circumstances under which Defendants have retained the benefits bestowed upon them by the Class are inequitable in that they result from Defendants' unlawful overcharges for branded and generic versions of Sensipar. The Class has no remedy at law.

**Utah**

215.     Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Utah at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants were aware of or appreciated the benefit bestowed upon them by the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Vermont**

216.     Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Vermont at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants accepted the benefit bestowed upon them by the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Virginia**

217.     Defendants unlawfully overcharged Class Members, who made purchases of or

reimbursements for branded and generic versions of Sensipar in Virginia at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants were aware of the benefit bestowed upon them. Defendants should reasonably have expected to repay the Class. The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of branded and generic versions of Sensipar. Defendants have paid no consideration to any other person for any of the benefits they have received from the Class.

### Washington

218.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Washington at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants were aware of or appreciated the benefit conferred upon them by the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

### West Virginia

219.    Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in West Virginia at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants were aware of or appreciated the benefit

bestowed upon them by the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Wisconsin**

220.     Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Wisconsin at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants appreciated the benefit bestowed upon them by the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Wyoming**

221.     Defendants unlawfully overcharged Class Members, who made purchases of or reimbursements for branded and generic versions of Sensipar in Wyoming at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants accepted, used and enjoyed the benefits bestowed upon them by the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

## JURY TRIAL DEMAND

222.     Plaintiff demands a trial by jury on all of the issues raised in this Complaint.

## PRAYER FOR RELIEF

223.     WHEREFORE, plaintiff prays for a judgment against defendant that:

       a.     grants plaintiff compensatory damages, including, but not limited to, pain, suffering, emotional distress, loss of enjoyment of life, and other non-

economic damages in an amount to be determined at trial;

b.       grants plaintiff compensatory damages for past and future damages, including, but not limited to, his pain and suffering for severe and permanent personal injuries that plaintiff sustained including healthcare costs and economic loss;

c.       grants plaintiff economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determined at trial;

d.       grants plaintiff punitive and or exemplary damages for the wanton, willful, fraudulent, and reckless acts of defendant, which demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public, in an amount sufficient to punish defendant and deter future similar conduct, to the extent allowed by applicable law;

e.       grants plaintiff attorneys' fees, costs of these proceedings, pre-judgment and post-judgement interest; and

f.       grants plaintiff such other and further relief as the Court deems just and proper under the circumstances.

Dated: February 6, 2020.

**RIVERO MESTRE LLP**

*Counsel for Plaintiff and the Class*
2525 Ponce de León Blvd., Suite 1000
Miami, Florida 33134
Telephone: (305) 445-2500
Facsimile:  (305) 445-2505
E-mail: arivero@riveromestre.com
E-mail: jmestre@riveromestre.com
E-mail: cwhorton@riveromestre.com
E-mail: ddaponte@riveromestre.com
Secondary: npuentes@riveromestre.com

By:  ___/s/ Andrés Rivero_____
        ANDRÉS RIVERO
        Florida Bar No. 613819
        JORGE A. MESTRE
        Florida Bar No. 088145
        CHARLES E. WHORTON
        Florida Bar No. 46894
        DAVID L. DAPONTE
        Florida Bar No. 1002724